**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**National Union Fire Insurance**
**Company of Pittsburgh, PA,**

       **Plaintiff,**

**-V-**                               **Case No. C-2-03-0160**
                                           **JUDGE SMITH**
                                         **Magistrate Judge Kemp**

**Richard O. Wuerth, *et al.*,**

       **Defendants.**


**<u>OPINION AND ORDER</u>**

       Plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania

("National") brings this action against Defendants Richard Wuerth and Lane Alton & Horst, who

represented National's insureds in a federal trial in February, 2002, which resulted in an adverse

verdict.

       Defendants Wuerth and Lane Alton & Horst have moved for summary judgment (Doc.

105) and Plaintiff National has also moved for summary judgment (Doc.109).  For the reasons

that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES**

Plaintiff's Motion for Summary Judgment.

## I.  FACTS

### A.    Background

Plaintiff National is an insurance company based in Pittsburgh, Pennsylvania.  Defendant Lane Alton & Horst (hereinafter "Lane Alton") is a law firm in Columbus, Ohio and Defendant Richard Wuerth is an attorney and a partner of the firm.

This case is a legal malpractice action arising out of a lawsuit filed by Nationwide Mutual Insurance Company (hereinafter "Nationwide") against National Catastrophe Adjusters (hereinafter "NCA"), McLarens Toplis North America, Inc. (hereinafter "McLarens"), and McLarens' employee Lany Wood in the Court of Common Pleas of Franklin County, Ohio on August 26, 1999.  The case was removed to this Court pursuant to the provisions of 28 U.S.C. § 1441, docketed as Case No. C2-99-1022 (hereinafter "the *Nationwide* case").  The matter was initially assigned to the late Judge Joseph P. Kinneary and was subsequently transferred to the docket of the Honorable Algenon L. Marbley.

Plaintiff National provided liability insurance coverage to McLarens and Lany Wood for the claims asserted against them in the *Nationwide* case.  Richard 0. Wuerth of the Lane Alton law firm was retained to represent them.  Plaintiff did not insure NCA, and Defendant Wuerth did not represent it in the *Nationwide* litigation.  Nationwide's claims against McLarens, Lany Wood, and NCA exceeded $16 million.  The trial to the jury, with Judge Marbley presiding, began on February 4, 2002.[1]  Prior to the submission of the case to the jury, Plaintiff entered

---

[1] The parties cite to the record in the *Nationwide* case. A complete copy of the Civil Docket in that action has been filed and the entire transcript of the trial was filed as well. This Court will take judicial notice of the proceedings in the *Nationwide* case. *See* Rule 201 of the Federal Rules of Evidence; *Sf. Louis Baptist Temple, Inc.*, *Federal Deposir Ins. Corp.*, 605 F.2d 1 169 (6th Cir. 1979) (court should take judicial notice of prior litigation on its own docket);

into a "high-low" settlement agreement with Nationwide on behalf of McLarens and Larry Wood. That agreement provided, among other things, that Plaintiff would pay Nationwide the amount of the jury's verdict up to the maximum of $8.25 million. On February 21, 2002, the jury returned a verdict in favor of Nationwide and against McLarens and Larry Wood for $16.2 million. Plaintiff paid Nationwide $8.25 million in settlement and was reimbursed by its reinsurers in the amount of $1,625,000. Plaintiff instituted this action on February 21, 2003 against Defendant Wuerth and his law firm claiming that Defendant Wuerth had committed malpractice in his representation of McLarens and Larry Wood in the *Nationwide* case, demanding the full $8.25 million it paid in settlement, notwithstanding that it has already recovered over $1.6 million from its reinsurers.

      **B.**     **The Underlying *Nationwide* case**

In 1997, Nationwide Mutual Insurance Company ("Nationwide") entered into a contract with NCA to provide claims adjusting services to Nationwide and its subsidiaries. Nationwide provided property damage insurance to Professional Hospitality Resources, Inc. ("PHR") for six hotels which it operated in Virginia Beach, Virginia. All six of those hotels were damaged by Hurricane Bonnie on August 28, 1998. Nationwide received notice of the potential claims from the insured and requested that NCA assist in adjusting the claims. NCA contacted McLarens to assist with this process and they in turn retained Larry Wood, an individual adjuster, to work on the project.

Mr. Wood was on the job eleven days before being removed. Nationwide alleged that

---

*Rodic v. Thistledown Racing Club, Inc.,* 615 *F.* 2d 736 (6th Cir. 1980) (court should take judicial notice of state court proceedings).

Mr. Wood exceeded his authority and was negligent in adjusting the claims.  Nationwide

claimed that he improperly committed Nationwide to compensate PHR for over $16 million

more than it otherwise would have paid if the claims had been properly adjusted.  Nationwide

initiated a lawsuit against NCA, McLarens, and Mr. Wood, referred to the Nationwide lawsuit

above.  McLarens was an insured of National and National retained Defendant Lane Alton to

defend the case.

Defendant Wuerth assumed responsibility for the case and handled it almost exclusively

by himself.  The trial began on February 4, 2002.  Defendant Wuerth, along with an associate,

Beth Lashuk, represented McLarens and Larry Wood, National Union's insureds.  Early in the

second week of trial, Defendant Wuerth advised several Lane Alton partners that he was not

feeling well.  At about the same time, he also told the Court he felt unwell.  However, he

continued with the trial until Thursday, February 14, when he suffered from tremors, and was

taken by Emergency Squad to Mt. Carmel East Hospital.  He was examined by his family

physician, James B. Soldano, the following day. Dr. Soldano opined, also in an affidavit, that

Defendant Wuerth was physically incapable of continuing to participate in the trial and would be

so for a significant period of time.

The Defendants moved for a mistrial arguing that Defendant Wuerth had become

incapacitated and could no longer proceed with the trial.  The Motion was argued before Judge

Marbley on February 20, 2002.  Judge Marbley, however, declined to grant a mistrial and other

Lane Alton attorneys stepped in and completed the trial.  In addition to the fact that Defendant

Wuerth became ill and was unable to complete the trial, Plaintiff also claims that Defendant

Wuerth has personal problems and alcohol abuse that interfered with his ability to practice as an

attorney and properly defend National's insureds.  Plaintiff highlights numerous incidents in which Defendant Wuerth made mistakes, failed to properly prepare for trial, and failed to inform National of critical issues and decisions regarding trial preparation.

In addition to asserting legal malpractice and misrepresentation claims against Defendant Wuerth, Plaintiff also alleges that Defendant Lane Alton is vicariously liable for Defendant Wuerth's legal malpractice as well as directly liable for its own wrongful acts, errors, and/or omissions.  Plaintiff has moved for summary judgment.  Defendants have also moved for summary judgment asserting various alternative grounds for its motion.

## II.    SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable

inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[2]  The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.*  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice" ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice.  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (*quoting Liberty Lobby*, 477 U.S. at 257).  The nonmoving party must

---

[2]  *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same.  One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150.  In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'"  *Id.* (*quoting Matsushita*, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III.   DISCUSSION

Plaintiff has asserted claims of legal malpractice and misrepresentation against Defendants Wuerth and Lane Alton.  Plaintiff has moved for summary judgment on both claims contending that "Defendants' liability is clearly established." (Pl's Mot. for Summ. J. at 1). Defendants Wuerth and Lane Alton have also moved summary judgment.  Defendants assert that there are alternative grounds for its motion, specifically: (1) Plaintiff's claims are barred by the malpractice statute of limitations; (2) Plaintiff is unable to show a causal connection between the alleged malpractice and the resulting damage; (3) Plaintiff lacks standing to sue; and (4) Defendant Lane Alton is a non-lawyer and therefore cannot be directly sued for malpractice and is not vicariously liable because Defendant Wuerth and other Lane Alton attorneys are not liable. (*See generally*, Def's Mot. for Summ. J. and Def's Reply).  The Court will first address the parties' arguments as they pertain to Defendant Wuerth and then turn to review Plaintiff's claims against Defendant Lane Alton.

**A.      Defendant Wuerth**

Defendants contend that both of Plaintiff's claims against Defendant Wuerth -- legal malpractice and misrepresentation --  are barred by Ohio's malpractice statute of limitations. This Court agrees.

**1.      Legal Malpractice Claim**

Under O.R.C. §2305.11(A), an action for legal malpractice "shall be brought within one year after the cause thereof accrued."  The Ohio Supreme Court, in *Zimmie v. Calfee Halter & Griswold*, 43 Ohio St.3d 54 (1989), set forth the standard with respect to the statute of limitations:

> Under R.C. 2305.11(A), an action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue its possible remedies against the attorney, or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later.

43 Ohio St. 3d at syllabus (*citing Omini-Food & Fashion, Inc. v. Smith*, 38 Ohio St.3d 385 (1988)).  *Zimmie* and *Omini-Food* require factual determinations as to (1) when a cognizable event occurred such that the client should have known he or she may have an injury caused by his or her attorney; and (2) when the attorney-client relationship terminated. *Smith v. Conley*, 109 Ohio St.3d 141, 142 (2006).  The statute of limitations begins running on the latter of these two dates.  *Id*.

The Complaint in this action was filed on February 21, 2003.  Thus, if either a "cognizable event" or termination of representation occurred after February 21, 2002, Plaintiff's malpractice claims against Defendant Wuerth were timely filed.

-8-

    a.      **Cognizable Event**

Plaintiff maintains that the "cognizable" event sufficient to start the running of the statute

of limitations did not occur until February 21, 2002, when the verdict was rendered in the

*Nationwide* case.  (Pl's Memo. in Opp. at 8-11).  To support its position, Plaintiff contends that

no injury resulted to Plaintiff from Defendant Wuerth's malpractice until the adverse verdict was

rendered, and consequently, Plaintiff "could not have 'discovered' that its injury was related to

any act or non-act of the Defendants until it in fact suffered an injury." (Pl's Memo. in Opp. at

9).  Defendants, on the other hand, assert that undisputed deposition and affidavit testimony

establishes that Plaintiff had actual knowledge of Defendant Wuerth's alleged malpractice prior

to February 21, 2002.  (Def's Mot. for Summ. J. at 20-28; Def's Reply at 1).  The Court agrees

with Defendants.

"The Ohio Supreme Court has never held that a party must be aware or suffer the full

extent of his injury before there is a cognizable event triggering the statute of limitations in a

legal malpractice action." *Griggs v. Bookwalter*, 2006 WL 2941041 *3 (Ohio App. 2 Dist.)

(internal citations omitted).  Instead, "case law applying *Zimmie* has defined a cognizable event

as 'an event that is sufficient to alert a reasonable person that his attorney has committed an

improper act in course of legal representation.'" *Ladanyi v. Crooks & Hanson Ltd*, 2007 WL

416926, *3 (Ohio App. 8 Dist.) (*quoting Spencer v. McGill*, 87 Ohio App.3d 267, 278 (1993);

and *Hickle v. Malone*, 110 Ohio App.3d 703, 707 (1996)). *Accord*, *Omlin v. Kaufman &*

*Cumberland Company*, *L.P.A.*, 8 Fed. Appx. 477 (6th Cir. 2001) (holding that a "cognizable

event" triggering the statute of limitations in legal malpractice cases occurs when the client

perceives "mistakes in lawyering."); *Griggs*, 2006 WL 2941041 at *3 (declaring "[k]nowledge

of a potential problem starts the statute to run, even when one does not know all the details.").

One Ohio appellate court has recently remarked on the harsh result of such a standard:

> Although we affirm the grant of summary judgment, we note the harsh result of this decision. This case stands for the unfortunate position that a litigant must identify the cognizable event and act on it, all before the litigant's case is resolved. Requiring a litigant to recognize and appreciate a legal concept he is not trained in and then requiring the litigant to file suit, all before his case is resolved places a heavy burden upon litigants.

*Szabo v. Goetsch*, 2007 WL 764544 (Ohio App. 8 Dist.).

Applying the foregoing law to the present case, it is evident that the cognizable event occurred prior to February 21, 2002. In early 1999, Mr. DeMaria, Director of Plaintiff's claims department, was assigned the claim asserted by Nationwide against McLarens and Mr. Wood and retained Defendant Wuerth when Nationwide instituted litigation. Mr. Ilardi, a Senior Vice President, was Mr. DeMaria's supervisor. The trial of the *Nationwide* case began on Monday, February 4, 2002. Mr. DeMaria did not attend the first week of trial, but after hearing reports that Defendant Wuerth "was doing a terrible job," he attended the trial commencing on Monday, February 11, 2002. The following is a summary of what Mr. DeMaria observed, believed, and concluded during the period February 11, 2002 to February 15, 2002:

- *February 11, 2002*:   The McLarens representative told DeMaria that Mr. Wuerth was "just generally performing badly in Court" (DeMaria Depo. at 105-106).

- *February 11, 2002*:   DeMaria became concerned that a judgment might be entered against McLarens in excess of policy limits because Mr. Wuerth "was shaking like a leaf and sweating like a pig and smoking like a chimney. He just looked like he was totally panic stricken" (DeMaria Depo. at 105-106).

- *February 11, 2002*:    DeMaria concluded that Mr. Wuerth "was obviously unprepared" to try the *Nationwide* case and "thought that because of Rick's performance, we were in trouble and a highly defensible case had been compromised" (DeMaria Depo. at 106-107).

- *February 11, 2002*:    DeMaria told Ilardi "that Rick looked totally unprepared [and] looked very nervous." Ilardi was "disturbed and upset" (DeMaria Depo. at 113).

- *February 12, 2002*:    DeMaria had breakfast with Lane Alton senior partner Rick Marsh. DeMaria viewed the meeting as his "opportunity to tell a senior partner at Lane Alton that in [his] view Mr. Wuerth had been mishandling [the *Nationwide*] case" (DeMaria Depo. at 108-113).

- *February 12, 2002*:    According to DeMaria, Mr. Wuerth "looked nervous, unprepared, panic stricken." DeMaria concluded on that day "[t]hat we had the wrong attorney representing us" and was concerned about how the *Nationwide* case would go "[b]ecause of his performance, most definitely" (DeMaria Depo. at 120-121).

- *February 12, 2002*:    DeMaria was of the opinion that Mr. Wuerth was approaching a breakdown "[b]ecause of his nervousness and his messing up witnesses' names and exhibits. It looked like he had lost control" (DeMaria Depo. at 122).

- *February 13, 2002*:    Mr. Wuerth advised DeMaria that he had no damage experts to rebut Nationwide's damage evidence. DeMaria concluded that the absence of such witnesses will "have an adverse impact on the case" (DeMaria Depo. at 128-129, 139-140).

- *February 14, 2002*:    DeMaria concluded that there will be an adverse verdict because Wuerth had not performed to expectations (DeMaria Depo. at 160-162).

- *February 15, 2002*:    Columbus attorney Percy Squire advised DeMaria that, in his opinion and that of Judge Marbley, "you had a good defense but your defense counsel blew it for you." DeMaria concludes that, because of Mr. Wuerth's "activities," DeMaria "couldn't settle the case for less than eight and a half to $9 million" (DeMaria Depo. at 166-170).

- *February 15, 2002*:    Ilardi begins settlement discussions with Nationwide's counsel and tells DeMaria that Mr. Wuerth is "responsible for why we're overpaying on this case" (DeMaria Depo. at 171-172).

Mr. Ilardi, like Mr. DeMaria, had concluded that Defendant Wuerth had made mistakes and committed malpractice prior to February 21, 2002.  Mr. Ilardi settled the *Nationwide* case the night of February 20, 2002.  Prior to doing so, he conferred with his colleague, Henry Williams, another Senior Vice President.  Mr. Ilardi told Mr. Williams that he believed Defendant Wuerth had committed malpractice, that he was contemplating a malpractice claim against Defendant Wuerth, and that he wanted Williams' opinion "as to whether or not a settlement of the *Nationwide* case would have an affect on a malpractice claim" against Defendant Wuerth.  (Williams Depo. at 6-9, 11, 16-19).

In addition, on February 15 and February 18, 2002, Mr. Ilardi spoke with Joseph Gerling, the head of the Lane Alton firm.  In both conversations, Mr. Ilardi told Mr. Gerling "that the pretrial defense [of the *Nationwide* case] had been mismanaged" by Defendant Wuerth.  (Ilardi Depo. at 51-52).  Mr. Ilardi testified as follows regarding his telephone conversations with Mr. Gerling on these dates:

> I remember telling Rick Marsh and/or Mr. Gerling, I'm certain I told Mr. Gerling, I don't remember telling Mr. Marsh.  But it's possible they work together or I may have said it twice, that we were going to go ahead and settle the case to protect our insured's interest, *but we were going to hold Lane Alton accountable*.
>
> * * * * *
>
> I definitely spoke with Joe Gerling before speaking with plaintiff's counsel [about settlement].  In fact, I believe that during the course of one of those discussions, *I asked Joe Gerling point blank, how much money he was willing to put on the table to get the case settled*."

(Ilardi Depo. at 63-64, 67) (emphasis added).  Mr. Ilardi also told Gerling "that Lane Alton

should notify their malpractice insurer that we plan to file a claim against them." (Ilardi Depo. at 67).  On February 20, 2002, Mr. Gerling, in response to Mr. Ilardi's directive, instructed Lane Alton's insurance broker to notify Lane Alton's malpractice insurer. (Gerling Aff., ¶¶ 10 and 11).

       Thus, Mr. Ilardi had determined to sue Defendants even before settling the case.

> Q.     In fact, sir, you had concluded in your mind to raise a claim with I guess Mr. Wuerth and Lane Alton prior to the time you entered into the settlement agreement with Mr. Brudney [Nationwide's counsel], correct?

> A.  Clearly -- --

> MR. CALLOW:  Objection, I'm sorry.

> A.     Clearly, my thinking at that time was that we had, we meaning AIG [Plaintiff], had been placed in a situation by Lane Alton's mismanagement of the case.
>
>      Lane Alton/Mr. Wuerth's mismanagement of the case that was now going to cause AIG [Plaintiff] to have to pay a substantially higher amount of money to settle the case, much less have a success of winning the case. *And so there was no doubt in my mind that I was going to seek recovery for some significant portion of that money from Lane Alton.*

(Ilardi Depo. at 97) (emphasis added).

       In summary, prior to February 21, 2002, both Mr. DeMaria and Mr. Ilardi had determined that Defendant Wuerth's mistakes in lawyering had caused injury to Nationwide in that Nationwide would be forced to overpay to settle the case.  In addition, and also prior to February 21, 2002, Mr. Ilardi had determined to sue Defendants for malpractice.  This Court therefore concludes that it is undisputable that a cognizable event involving Defendant Wuerth occurred

-13-

prior to February 21, 2002. However, the Court's inquiry as to the accrual date in this legal

malpractice claim does not end here; the parties also dispute whether or not Defendant Wuerth's

representation of McLarens and Larry Wood terminated prior to February 21, 2002.

### b.    Termination of Representation

Defendants argue that the Defendant Wuerth's representation of McLarens and Larry

Wood terminated on February 14, 2002, more than one year before Plaintiff's Complaint. (Def's

Mot. for Summ. J. at 29). Plaintiff counters that Defendant Wuerth's representation did not

terminate until after February 21, 2002, thus making the filing of Plaintiff's February 21, 2003

Complaint timely under O.R.C. § 2305.11(A). (Pl's Memo. in Opp. at 11-12). "[T]he attorney-

client relationship is consensual, subject to termination by acts of either party. *Brown v.*

*Johnstone*, 5 Ohio App.3d 165, 166-167 (1982). "An attorney-client relationship can terminate

upon the affirmative act of either party." *Savage v. Kucharski*, 2006 WL 2796264 (Ohio App.

2006). The point at which the attorney-client relationship is terminated is a factual question to

be resolved by the trier of fact. *Smith v. Conely*, 109 Ohio St.3d 141, 142 (2006) *citing Omni*

*Food*, 38 Ohio St.3d at syllabus. For a trial court to take this issue away from a jury, the court

must be able to point to a clear and unambiguous act which signals the end of the relationship.

*Mobberly v. Hendricks* 98 Ohio App.3d 839, 843, (Ohio App. 9 Dist.1994) (*citing Mastran v.*

*Marks*, Summit App. No. 14270, 1990 WL 34845). For example, Ohio Courts have found that

for statute of limitations purposes, a lawyer's representation of a client terminates when the

lawyer discontinues all work on behalf of the client and the client is aware that he or she has

done so. *See e.g.*, *Markham v. Brandt,* 2006 WL 783464 (S.D. Ohio 2006); *Trombley v.*

*Calamunci, Joelson, Manore, Farah & Silvers, LLP,* 2005 WL 1009841 (Ohio App. 2005);

*Koerber v. Levey & Gruhin,* 2004 WL 1344834 (Ohio App. 2004).

In the present case, in the early morning of February 14, 2002, Defendant Wuerth collapsed at his home and was taken to the hospital.  Defendant Wuerth's doctor, Dr. Soldano opined that Defendant Wuerth was physically incapable of continuing representation in the *Nationwide* case. (Soldano Depo. at 32-34).  Consistent with his opinion, Dr. Soldano ordered Defendant Wuerth to immediately stop working and remain at home. (Sec. Wuerth Aff. ¶ 13).  Defendant Wuerth followed Dr. Soldano's orders and "performed no legal services for or on behalf of McLarens or Mr. Wood in connection with the *Nationwide* case, or otherwise, after February 13, 2002"; he "provided no assistance whatsoever in connection with the defense of the *Nationwide* case after February 13, 2002"; and he has "had no contact or communication with Mr. Larry Wood or with any representative of McLarens since February 13, 2002." [Sec. Wuerth Aff., ¶ 14].  Finally, except for proceedings in this legal malpractice case, Defendant Wuerth has had no contact or communication with any representative of Plaintiff in any way related to the *Nationwide* case since February 13, 2002. (Sec. Wuerth Aff. ¶ 14).

The Court finds that the evidence demonstrates that Plaintiff knew that Defendant Wuerth's representation of McLarens and Woods in the *Nationwide* case had terminated prior to February 21, 2002.  Mr. DeMaria testified that, on February 14, 2002, Rick Marsh advised him that Defendant Wuerth had been taken to the hospital and that he would not be continuing with the *Nationwide* case or be of any assistance (DeMaria Depo. at. 148-150).  Mr. DeMaria acknowledged that Mr. Marsh took over the representation of McLarens and Mr. Wood on February 14, 2002 (DeMaria Depo. at 163).  Mr. DeMaria testified that he knew on February 14, 2002, that Defendant Wuerth would not be returning to work on the *Nationwide* case and that

-15-

neither he nor Mr. Ilardi was surprised that Defendant Wuerth would not be doing so. (DeMaria Depo. at 150-152).  Mr. DeMaria also testified that he knew on February 14, 2002, that Richard Wuerth was out of the case and was replaced by Rick Marsh. (DeMaria Depo. at 163-165).

Finally, on February 14, 2002, Mr. DeMaria and Plaintiff's Cleveland lawyer, Steven Janik, ordered Rick Marsh to prepare and file a motion for mistrial due to Defendant Wuerth's inability to continue representing McLarens and Larry Wood (Marsh Aff., ¶ 8; DeMaria Depo. at 152-153, 166).  DeMaria also sought the advice of Plaintiff's Columbus attorney, Percy Squire, and he likewise recommended that a motion for mistrial be filed (Squire Depo. at 49-50).  All of Plaintiff's representatives -- Messrs. DeMaria, Janik, and Squire -- were attorneys, and all of them were of the belief on February 14, 2002 that, because Defendant Wuerth could no longer represent McLarens and Larry Wood in the *Nationwide* case, a mistrial was in order.  Per Messers. DeMaria, Janik, and Squire's direction, a motion for mistrial was filed on February 15, 2002 (Marsh Aff., ¶ 12).  Mr. Marsh faxed copies of it to Messrs. DeMaria, Janik, and Squire on Monday morning, February 18, 2002 (Marsh Aff., ¶ 12; Exh. A).  That motion informed anyone who received it that Defendant Wuerth's representation of McLarens and Larry Wood ended on February 14, 2002.  (*See* Marsh Aff., Ex. A).  Judge Marbley noted the termination of Richard Wuerth's representation of McLarens and Larry Wood the morning of February 20, 2002:

> THE COURT:  As a housekeeping matter, I will note for the record that Mr. Rick Marsh has been substituted as trial counsel for Mr. Richard Wuerth.  Ms. Beth Lashuk remains as counsel of record as she has been a lawyer for McLarens Toplis and Mr. Wood throughout these proceedings.  Mr. Jeff Hutson, who I believe is a partner in the Lane, Alton and Horst firm, is going to argue the Rule 50 motion on behalf of McLarens Toplis

and Mr. Wood.

(*Nationwide* Tr. Vol. IX at 5).

Plaintiff seeks to refute this evidence by asserting that the attorney-client relationship could not have been terminated because "Wuerth never formally withdrew as counsel for National Union's insured as required by S.D. Ohio Civ. Rule 83.4(d); and Wuerth was listed as trial counsel for National Union's insured on pleadings filed as late as February 22, 2005." This Court must reject Plaintiff's assertions as both the Ohio Supreme Court and the Sixth Circuit have specifically held that compliance with local court rules regarding withdrawal of counsel is not relevant to determining whether a lawyer's representation of a client has terminated for statute of limitations purposes. *See Smith v. Conley*, 109 Ohio St.3d at 144; *Omlin v. Kaufman & Cumberland Co.*, 8 Fed. Appx. 477 (6th Cir. 2001).

Based on the foregoing, the Court finds that reasonable minds cannot differ as to whether Defendant Wuerth's representation in the *Nationwide* case terminated prior to February 21, 2002. Therefore, because the Court finds that, prior to February 21, 2002, a cognizable event involving Defendant Wuerth occurred, and Defendant Wuerth's representation of McLarens and Woods in the *Nationwide* case had terminated, Plaintiff's claim against Defendant Wuerth is barred by Ohio's malpractice statute of limitations. Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiff's legal malpractice claim against Defendant Wuerth.

## 2. Misrepresentation Claim

Defendants maintain that Plaintiff has masqueraded its malpractice claim as a

misrepresentation claim in order to circumvent Ohio's one-year statute of limitations for malpractice actions. (Def's Mot. for Summ. J. at 36-38). Consequently, Defendants argue that Plaintiff's misrepresentation claims against Defendant Wuerth are barred by Ohio's malpractice statute of limitations. (*See* Def's Mot. for Summ. J. at 36). This Court agrees.

Plaintiff's "claim" of misrepresentation is that Defendant Wuerth "provided faulty information and/or advice." (*See* Compl. ¶ 23). In Plaintiff's Second Supplemental Responses to Defendants' Interrogatories, served on November 15, 2005, Plaintiff stated that the sole and exclusive bases for its purported misrepresentation claim were the acts it claimed constituted legal malpractice. (*See* Pl. Second Supp. Ans. to Interrog. No. 14).

This is not the first time a Plaintiff has sought to characterize malpractice claims as something else in order to circumvent the statute of limitations. In *Omlin v. Kaufman & Cumberland Company, L.P.A.,* 8 Fed. Appx. 477 (6th Cir. 2001), the Sixth Circuit affirmed a summary judgment granted to the defendant in an Ohio legal malpractice case and held:

> Although Omlin argues that this action was not a malpractice action, but a breach of contract, breach of fiduciary duty, and tort action, an "action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice within the meaning of R.C. 2305.11, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages." *Muir v. Hadler Real Estate Mgmt. Co.,* 4 Ohio App.3d 89, 446 N.E.2d 820, 822 (Ohio Ct. App. 1982). The *Muir* court noted that: "[m]alpractice by any other name still constitutes malpractice … [M]isconduct may consist either of negligence or a breach of the contract of employment. It makes no difference whether the professional misconduct is found in tort or contract, it still constitutes malpractice. Accordingly, the one year malpractice statute of limitations set forth in R.C. 2305.11 is applicable." *Id.* Thus, Omlin's attempt to characterize her action as something other than a legal malpractice proceeding is without merit.

-18-

*Id*. at 479. *Accord Thut v. Canala,* 2005 WL 2000744 (Ohio App. 2005); *Triplett v. Benton,* 2003 WL 22390065 (Ohio App. 2003).  An identical case is *Dingus v. Kirwan,* 2006 WL 2384070 (Ohio App. 2006), where the plaintiff sued his lawyer for fraud committed while prosecuting a lawsuit.  In affirming a summary judgment based upon the malpractice statute of limitations, the Ohio appellate court held:

> Clothing a malpractice action in the language of fraud, does not convert the action into one based on fraud. [Citation omitted]. Malpractice by any other name is still malpractice. [Citation omitted].  Most importantly, simply re-labeling a malpractice action as a fraud action will not extend the statute of limitations. [Citation omitted].

*Id*.  The Court agrees with Defendants that Plaintiff cannot save an untimely filed legal malpractice claim by calling it something else.  As the *Muir* Court put it, "[m]alpractice by any other name still constitutes malpractice." *Muir*,  4 Ohio App.3d at 90.  Accordingly, Plaintiff's claim of misrepresentation is barred by the one-year period of limitations set forth in O.R.C. § 2305.11(A).

**B.     Defendant Lane Alton**

Plaintiff seeks to hold Defendant Lane Alton vicariously liable for Defendant Wuerth's alleged malpractice. (Pl's Memo. in Opp. at 16).  Plaintiff also seeks to assert a direct claim for legal malpractice against Defendant Lane Alton. (Pl's Memo. in Opp. at 16).  Defendants argue that Defendant Lane Alton cannot be liable for Defendant Wuerth's malpractice because Defendant Wuerth is not liable. (Def's Mot. for Summ. J. at 11-12).  This Court Agrees.  Defendants further argue that Defendant Lane Alton, a limited liability company, can only be

vicariously liable for legal malpractice. (Def's Mot. for Summ. J. at 12-15).  Again, this Court agrees.

### 1.      Claim for Vicarious Liability for Defendant Wuerth's Alleged Malpractice

It is a well-settled principle of Ohio law that for the principal to be liable, the agent must be liable.  *See e.g.*, *Soltis v. Wegman, Hessler, vanderburg & O'Toole*, 1997 WL 64049, *3 (Ohio App. 1997) (holding "[a]bsent negligence on the part of [the defendant lawyer] as an employee, the law firm and its principals as the employer cannot be held liable); *Comer v. Risko*, 106 Ohio St.3d 185, 189 (2005) (holding "[i]f there is no liability assigned to the agent, it logically follows that there can be no liability imposed upon the principal for the agent's actions); and *Flynt v. Brownfield, Bowen & Bally*, 882 F.2d 1048 (6th Cir. 1989) (applying Ohio law to affirm a grant of summary judgment to a general partner of a lawyer alleged to have committed legal malpractice, and explaining that because the statute of limitations had run against the lawyer who committed the purported legal malpractice, his partner could not be vicariously liable).

Plaintiff has not argued against this well-settled principle, but instead merely states that its "derivative claims against Lane Alton are not barred by the statute of limitations as the claims asserted against Defendant Wuerth were timely."  (Pl's Memo. in Opp. at 16-18).  For the reasons set forth *supra*, this Court has rejected Plaintiff's assertion that Plaintiff's malpractice claims against Defendant Wuerth were timely and instead has found that Defendant Wuerth has no liability to Plaintiff because the statute of limitations has run. *See supra* at III.A. Consequently, Defendant Lane Alton cannot be held liable for Defendant Wuerth's alleged malpractice.

-20-

2.      **Direct Claim for Legal Malpractice**

Plaintiff has cited no legal authority to support its contention that it can assert a "direct claim" for legal malpractice against Defendant Lane Alton. (Pl's Memo. in Opp. at 16-18). Defendants argue, and this Court agrees, that due to the nature of a legal malpractice claim, a "direct claim" for legal malpractice can only be brought against a member of the legal profession. (*See* Def's Reply at 11-15).

Malpractice is "professional conduct [by] members of the medical professions and attorneys." *Dingus v Kirwan*, 2006 WL 2384070, *10 (Ohio App. 2006) (citation omitted). Malpractice occurs when a member of the medical profession or attorney fails to "(1) treat a case professionally; or (2) fulfill a duty implied into the employment law; or (3) exercise the degree of skill or care exercised by members of the same profession practicing in the same locality." *Id.* It is well-settled that the first, and indispensable, element of a direct claim for legal malpractice is the existence of an attorney-client relationship. *See e.g.*, *Krahn v. Kinney*, 43 Ohio St.3d 103 (1989); *Landis v. Hunt*, 80 Ohio App.3d 662 (1992).

Defendant Lane Alton is not an attorney.  Rather, it is a limited liability company organized under Chapter 1705 of the Ohio Revised Code. (Gerling Aff. ¶ 3).  Defendant Lane Alton has never taken the bar examination; it is not admitted to the bar; and it is not subject to professional discipline.  Since Defendant Lane Alton is not an attorney, an attorney-client relationship with it could never be established.  Instead*,* the attorney-client relationships are with the individual lawyers of the firm, and the firm's liability, if any, is dependent upon the liability of those individual lawyers.  This is the essence of vicarious liability.

The Court finds *Youngstown Park & Falls St. Ry. Co. v. Kessler* 84 Ohio St. 74 (1911), instructive.  In *Youngstown*, the plaintiff asserted a "direct claim" for medical malpractice against a railroad.  The Ohio Supreme Court held:

> It is sufficient to say with reference to this contention that a railroad company cannot be guilty of malpractice.  *It is not authorized to practice medicine or surgery,* and therefore any contract it might make to do so would be not only ultra vires, *but in direct conflict with the laws of this state regulating the practice of medicine and surgery.*  Therefore the statute limiting the time in which actions for damages for malpractice may be brought has no application to this suit.

> No such action [medical malpractice] will lie against a railroad company, and, if that is the cause of action stated in this second amended petition, then it would be vulnerable to a demurrer, not only because of the statute of limitation, *but also because it does aver facts sufficient to constitute a cause of action.*

*Id*. at 77 (emphasis added).

Accordingly, this Court finds that a "direct claim" for legal malpractice cannot be asserted against a non-attorney.  Regardless, Plaintiff's purported "direct claims" against Defendant Lane Alton are not "direct."  According to Plaintiff's Memorandum in Opposition, its "direct claims" are based exclusively on the alleged acts or omissions of attorneys Defendant Wuerth, Beth Lashuk, Rick Marsh, and Jeffrey Hutson.[3] (*See* Pl's Memo. in Opp. at 16-17).  Plaintiff is claiming that Defendant Lane Alton is liable for their malpractice.  These are claims for vicarious, not direct, liability.  In *Albain v. Flower Hospital*, 50 Ohio St.3d 251 (1990), the Ohio Supreme Court held: "[i]t is a fundamental maxim of law that a person cannot be held

---

[3]Plaintiff's expert James Coogan testified that, when he mentioned the malpractice of Lane Alton in his report, he was actually referring to the negligence of the individual attorneys in the firm and particularly that of Richard Wuerth, Rick Marsh, Jeffrey Hutson, Joseph Gerling, and Beth Lashuk. (Coogen Depo. at 109-110).  Plaintiff's "nationally recognized expert" Phillip Feldman testified that most of those individuals should have been sued. (Feldman Depo. at 180).

liable, other than derivatively, for another's negligence." *Id*. at 254-255.  Similarly, in *Comer v. Risko*, 106 Ohio St.3d 185 (2005), the Ohio Supreme Court stated: "[a]n agent who committed the tort is primarily liable for its actions, while the principal is merely secondarily liable." *Id*. at 189.  Thus, Defendant Lane Alton can only be liable for the alleged malpractice of Mr. Wuerth, Mr. Marsh, Mr. Hutson, and Ms. Lashuk, only if they are liable.  Mr. Wuerth is not liable, because Plaintiff's claims against Mr. Wuerth were untimely. *See supra* at III.A.  Mr. Marsh, Mr. Hutson, and Ms. Lashuk cannot be liable because they have never been sued and it is too late to sue them now.

A virtually identical situation occurred in *Comer v. Risko*, 106 Ohio St. 3d 185, (2005).  In that case, the plaintiff sued a hospital claiming that two physicians, who allegedly were its agents, committed malpractice.  Just as in this case, the plaintiff did *not* sue the physicians who committed the alleged malpractice.  After the statute of limitations on the plaintiff's unasserted malpractice claims against the physicians had expired, the trial court granted the hospital's motion for summary judgment.  In affirming the trial court's judgment, the Supreme Court held:

> Consequently, a direct claim against a hospital premised solely upon the negligence of an agent who cannot be found liable is contrary to basic agency law.
>
> *   *   *   *   *
>
> Drs. Wall and Schlesinger, the … physicians who read and interpreted the x-rays, were not named defendants in this case.   The statute of limitations as to them has expired, thereby extinguishing their liability, if any.   *In the absence of the tortfeasor's primary liability, there is no liability that may flow through to the hospital on an agency theory.  Consequently, there is no genuine issue of material fact, and [the defendant-hospital] is entitled to judgment as a matter of law.*

*Id*. at 190-192 (emphasis added).

-23-

This case is no different.  The purported liability of the Lane Alton lawyers who Plaintiff never sued was extinguished by the statute of limitations.  Accordingly, Lane Alton cannot be liable for their alleged "negligence."

Therefore, Defendants are entitled to summary judgment in their favor on Plaintiff's "direct claims" of legal malpractice against Defendant Lane Alton.

### IV.    CONCLUSION

Based on the above, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 105) and **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 109).

The Clerk shall remove Documents 105 and 109 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**


*/s/ George C. Smith*_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**